## BAKER *versus* ROWAN.

1. Where A., being the administrator of his father's estate; and, to secure certain family slaves, procured an agent to attend the sale of the estate, and purchase the slaves in question, at a fair price: and, B., having a deed of trust upon the slaves, (which was wholly unknown to the administrator, or the agent) attended the sale, but concealed the existence of the deed; and, afterwards took possession of the slaves, in the night time, and, under circumstances to induce A. to believe, that they were about to be removed without the limits of the State: Held, that these circumstances, especially the concealment of the deed, and the fact of the slaves being family property, so as to render their restoration, in specie, desirable; presented a proper case for Chancery jurisdiction, and authorised the issuance of a *ne exeat.*

2. To constitute a necessary party to a suit in chancery, there must exist not only a nominal title or interest, but an *interest in fact; or such an agency or trust in right of another, as to make his recognition as a party, essential to the security of the principal, or cestui que trust.*

This case was determined in Madison Circuit court, on a final hearing, on a bill in Chancery. Rowan, the complainant below, being the administrator of his father's estate—in pursuance of law, and under the necessary order, proceeded to sell the personal estate of his intestate. Part of this property was certain slaves, who, being family negroes, Rowan wished to preserve; and, for that purpose, employed an agent to purchase them, at the administration sale—which

the latter, accordingly, did, at a fair value. Baker, the plaintiff in error, at this time, as appeared from the facts of the cause, held a deed of trust, executed by the intestate, upon the slaves in question, which fact he never disclosed to Rowan, or his agent, although present at the sale. Afterwards, Baker having obtained possession of two of the slaves, removed them, in the night time, from the possession of Rowan, without the consent of the latter, and under circumstances to induce the latter to believe that the slaves would be removed beyond the State: to prevent which, and to obtain relief in general, Rowan filed his bill in Chancery; and succeeded in obtaining the issuance of a *ne exeat*, under which the slaves were attached, and made subject to the final decree of the court. This decree restored the slaves to Rowan, dissolved the claim of Baker, under the deed, to the slaves, and established the full title of Rowan—with a reservation, however, that the decree should not prejudice the legal or equitable rights of Baker, as a creditor of the intestate.

To reverse this decree, the defendant below, contended, in this court—first, that the trustee should have been joined in the bill; secondly, that the granting of the *ne exeat* was error, the remedy being at law; thirdly, that the complainant acquired no title by a purchase, at his own sale; and, fourthly, that equity had no cognizance of the case.

*M' Clung*, for complainant—*Hutchinson, contra.*

SAFFOLD, J.—The facts material to the decision of this case, may be thus briefly stated, as appearing from the bill, answer, exhibits, and proof. In Octo-

ber, 1824, Rowan, the complainant, as administrator of James Rowan, dec'd, sold, by order of the proper conrt, the personal property of his intestate, on a credit of twelve months. At the sale, one John Miller, for the complainant, bought the slaves, in contest, (*Sally* and her children, *Nancy* and *Harvey,*) at a fair price. Afterwards, the complainant, as administrator, made his settlement with the Orphans' court, and therein accounted for, and satisfied the demand for said negroes, as having been purchased in the name of Miller. The slaves, are alleged, in the bill, to have been family negroes, for which reason, the complainant, (being the son of the intestate,) was desirous to obtain them. During these transactions, and until the time of the purchase of the slaves, as mentioned, both the complainant and Miller remained ignorant of the existence of any deed of trust, or other incumbrance, such as is hereinafter mentioned. Baker was present at the administrator's sale, but made no disclosure of the existence of his deed of trust, or any lien, in his favor, on the slaves: yet, in November, 1826, said Baker, (plaintiff in error) in order to establish a lien, which he claimed by virtue of a deed of trust, for said slaves, and others, executed by complainant's intestate, in his life time, to one Thomas Miller, as trustee, to satisfy a debt due him, he (said Baker) removed two of the negroes, said *Sally* and *Harvey*, from Jackson county, where the complainant had left them, to his (Baker's) residence, in Madison. The removal of the slaves was without the complainant's leave, and for the avowed purpose of having them sold, either under the deed, or executions, to be issued on judgments for the same debt, in favor of Baker, against the complainant, as administrator, &c.

The bill, however, charges, that from the time and manner of the removal of the slaves, (it having been in the night,) and from the fact, that Baker had not, within the complainant's knowledge, any permanent property, in the State, to detain him, "he had a positive fear and belief, that said Baker would, presently, remove himself, and said Sally and Harvey, beyond the limits of this State—and, thereby, greatly defraud and injure the complainant." He, therefore, prayed and obtained a writ of *ne exeat*, against Baker, and an attachment against the slaves, to secure their detention within the State, subject to such decree as might be rendered on the bill : he also, prayed a restoration of the property, and that Baker's deed should be vacated; or, for any more equitable relief.

The writs having, accordingly, issued, their execution consisted, alone, in the seizure and detention of the slaves. Some of the facts, charged, have been denied, or differently explained, by the answer: to determine the truth of which, reference has been had to the proofs ; and, from which, they appear to be substantially as above stated. The answer, however, denies any intention, on the part of the respondent, to remove himself, or the slaves, beyond the reach of process: it contains no demurrer to the relief sought by the bill; but, concludes with a prayer, that the slaves may be sold, to satisfy his demand.

Upon these facts, a hearing was had in the court below, when it was decreed, that the slaves attached in Baker's hands, should be restored to the complainant.—That Baker's deed should be vacated, so far as it could otherwise be used, in opposion to the complainant's title to the two slaves, attached, and a third, against which the writ had not issued, and the in-

crease.—That said slaves should be quit of the respondent's claim to them; and, that the complainant recover his cost. But, it was, also, therein provided, that the decree should not prejudice the legal or equitable rights of the respondent, Baker, if any, as a creditor of the intestate's estate, upon the judgment, obtained at law, as aforesaid.

The only assignments of error, insisted upon are—

1. That the trustee should have been made a party to the bill.

2. The bill should have been dismissed, the complainant's remedy, if any, being at law.

The assignment, that the complainant acquired no title, by purchasing at his own sale, as administrator, is understood to be abandoned, on the authority of former decisions of this court.—*Gayle* vs. *Singleton*[a]—*Brannan* vs. *Oliver*[b]

1. On the first assignment, it is sufficient to observe, that the mere circumstance of an individual being, or having been, a trustee or agent, in reference to the subject of controversy, does not constitute him a necessary party to the suit. One, in such situation, is not presumed to have any personal interest: if it be shewn that he has, the effect would be different. To constitute a necessary party to a suit in Chancery, there must exist, not only a nominal title or interest, but an *interest in fact ; or, such an agency or trust, in right of another, as to make his recognition as a party essential to the security of the principal, or cestui que trust.* It has been so held, in this court. Here the *cestui que trust*, being himself a party, and the trustee presumed without interest, it was unnecessary to have made the latter a party.

2. The other asssignment involves a principle of

more difficulty. · It presents the question, whether, in a case like this, the cognizance of Chancery may be exercised to prevent the removal of property beyond the jurisdiction of the court, and to determine the right to it, under the peculiar circumstances. The principle has generally prevailed, in the adjudged cases, as contended, in argument, that the writ of *ne exeat* cannot be granted, for a debt or demand due, and recoverable at law; that it applies only to equitable demands, and such as are in the nature of debts actually due. *Seymour* vs. *Hazard.*[a] ·

A statute of this State of 1823, was evidently intended to relieve this writ from some of the restraints of the previous practice, and to give it a more extended operation : it declares, " it shall be lawful to grant writs of *ne exeat,* not only in cases where a sum of money is due, but, also, where the complainant has an equitable claim, or demand against the defendant." This court has decided, under the joint influence of the earlier cases and this statute, (and I think the principle sustainable, without the aid of the latter,) that where the courts of common law, and Chancery have concurrent jurisdiction, and no action has been commenced *at law*—by resorting to Chancery, the writ *ne exeat* will be granted, on the proper shewing, that the defendant is about to remove beyond the jurisdiction of the court. *Lucas* vs. *Hickman.*[b]

It is further objected, that the complainant's affidavit is defective ; that it is not sufficiently positive, in the averment of his (Baker's,) intention to remove himself or the property : that no declaration by himself, of his intention to do so, or other substantive fact, shewing such intention, was stated, in the affidavit ; but, on the complainant's *positive fear and belief,*

[a] 1John.Ch Rep. 2.—2 Atk. 210— 10 Vez.Jr. 165—6 Ib. 283.

[b] 2Stewart, 111.

from the circumstances mentioned, that the removal would take place.

In this respect, as well as others, even in the English Chancery, the earlier restraints, to which this writ was subject, have been materially relaxed. In *Russell* vs. *Asby*,[a] it was held, that a general affidavit of belief, of the defendant's intention to quit the kingdom, was sufficient, without the circumstances, upon which that belief was founded. The *Lord Chancellor* said, "As to the defendant's purpose of going abroad, it can be sworn to, only upon belief. It is only swearing to intention. There cannot be a positive affidavit. The deponent might set forth the ground of his belief. A case might happen, in which circumstances might be stated, as, if the defendant had taken his passage," &c. But, that such was not indispensable. That case, also, assimilates an application for the writ *ne exeat*, in equity, to a requisition of special bail, in proceedings at common law. *Buller*, Justice, to whom the application for the writ was made, maintained the analogy, and said, the affidavit might contain only the same degree of certainty, in either case. Nor did the *Lord Chancellor*, on a motion, subsequently made, to supersede the writ, intimate any different opinion : on the contrary he overruled the motion—at the same time, holding the language above ascribed to him. On principle, also, I think, only the same degree of certainty can be required, in either case: they admit of only the same. The effect of an arrest, and requisition of bail, is no more oppressive, in Chancery than at law. On this subject, the Chancellor of New York, remarks, " that the English idea, (alluding, more particularly, to that which formerly prevailed,) that a *ne exeat* is a prero-

[a] 5 Vez. J. 96

gative writ, is inapplicable here. This writ has now become an ordinary process of courts of equity; and it is as much a writ of right as any other process, used in the administration of justice. It must be granted whenever a proper case is presented." He also held it applicable to citizens of other States, as well as to residents.

It may, also, be observed, that the course of our Chancery practice, requires from the complainant, before obtaining a *ne exeat*, a bond of indemnity to the defendant, for all damages he may sustain, by reason of the wrongful suing out of the writ. The same is required before obtaining an attachment in Chancery, against the defendant's property. This is a degree of protection, which is not afforded in ordinary cases of special bail. The fact of Baker's having removed the slaves by night, might well strengthen the apprehension of his intention to remove. In this case, it is worthy of special notice, that the process issued, has operated exclusively on the property in contest; and this was the object of the proceeding. With the *ne exeat*, an attachment issued against the property in dispute; and the writs directed the sheriff, that the execution of the latter would suffice; or, if Baker, after being arrested, would surrender the property, subject to the order of Chancery, that the officer should, in that event, discharge his person—otherwise, that he should be held to bail. The property alone was taken and detained in the custody of the sheriff.

This mode of proceeding by process, in the nature of an attachment in Chancery, for specific property, to which the complainant alleges title; and the practice of founding the alternate remedy on the same

vol. 2.        47

bill, on which the *ne exeat* issues, has prevailed with us, since the organization of our State government. Nor is it understood to be a practice exclusively ours, but one that is virtually recognised, under different modifications, in England, and many of the States of the Union.

The further, and, perhaps, more difficult inquiry, arising in this case, is, whether this matter of contest was a proper subject of Chancery cognizance; or, should the parties have been left, according to the argument of the plaintiff in error, to litigate the subject at law? Would the action of trover, or detinue, with the aid of special bail, as authorised by statute, have afforded an adequate remedy? If either would have furnished a perfect remedy, this consideration, alone, constitutes a sufficient objection to the exercise of Chancery jurisdiction. The action of *replevin*, is, with us, considered obsolete.

The grounds mainly relied on to sustain the jurisdiction, are, that the property in question is of a favorite description—being family negroes; and that the action at law could not certainly, restore the specific property.—That Baker was present at the administrator's sale, and failed to disclose the existence of his deed of trust, or give any notice of his claim; thereby practicing a fraud on the purchasers of the property.—That, for this fraudulent concealment of the deed, Chancery is competent to vacate it.—That justice and equity require it to be done; and, that the effect of concealing the instrument, is more fatal to its validity in Chancery, than at law.

In *Virginia*, the principle is well established, and has long prevailed, that, where it is necessary, in order to preserve specific property, which is of pecu-

liar value or interest, to the owner, that Chancery will interfere, rather than leave the party to his remedy at law, where he can only recover remuneration in damages; and that family slaves may often become the proper subjects of such interference.

In the case of *Wilson & Trent* vs, *Butler and others*,[a] the opinion of the court, by Judge *Roane*, declares "that, although a party, whose property is taken in execution, to satisfy the debt of another, may proceed to recover the property, or damages, for the taking or detaining thereof, in a court of law; and although it is competent to a sheriff, having doubts as to the title of property, taken in execution, to demand from the creditor, an indemnifying bond, pursuant to the act, in such case provided, yet, that neither of these remedies are in exclusion of a proceeding in equity, having, for its object, the *retention* of the property, in *specie*. Every argument on which the jurisdiction of the courts of equity, to compel a performance of contracts *in specie*, is founded, is supposed to hold with equal force, at least in favor of retaining a subject of property, which another, having no title thereto, claims to arrest and dispose of, by means of an execution, rather than to turn the rightful owner round, to seek an uncertain and inadequate reparation, in damages."

In the case of *Randolph* vs. *Randolph et al*,[b] the same court had previously given a strong intimation, in favor of the same principle. In that State, at a later period, a similar doctrine has prevailed. The case of *Allen* vs. *Freeland*,[c] recognises the authority of *Wilson & Trent* vs. *Butler and others*: and maintains the principle, that, in regard to slave property, a court of equity ought to use a greater latitude, in

a 3 Munf. 559.

b 3 Munf. 99

c 3 Rand. 170.

applying its restraining power, than in other personal property ; that, in such cases it is a necessary consideration, whether, under all the circumstances, it is better, for the advancement of justice, that the Chancery should interfere, or leave the party to his legal remedy. In expressing his opinion, in this case, Judge *Greene* remarked, "that he should incline to think, slaves ought, *prima facie*, to be considered of peculiar value to their owners, and not properly a subject for adequate compensation, in damages, as land is considered to be to a purchaser ; but, that this presumption may be repelled, as in the case of persons purchasing slaves, for the avowed purpose of selling them again." That case, however, was found not to justify the interposition of Chancery.

This doctrine of preserving the specific article for the legal owner, in the case of slaves, is understood to have prevailed in Virginia, to a greater extent than in many other States. The question, how far it should be sustained has never before been fully presented for the consideration of this court ; nor does this case depend on the abstract principle. But it is so far material, as to elicit an intimation of our opinion upon it. We freely concede, that slave property is, in general, distinguishable from other chattels, in this respect ; that family slaves, to which owners are attached, should be preserved in *specie*, by the interposition of Chancery, rather than leave the party to seek reparation in damages, by suit at law—even with the *partial* assurance of restoration afforded by the action of *detinue*. The same principle applies equally, where, from other circumstances, a peculiar value or interest attaches to slaves or other property ; but it must be such as to distinguish the article from other chattels of like nature.

If the case, under consideration depended alone on this principle, I should consider the allegations of the bill insufficient to warrant the interposition of Chancery. It describes the property in general terms, as family 'slaves, for which reason the complainant desired to retain them; but the circumstances which could create peculiar value or attachment, are not stated with sufficient precision; nor is even the existence of particular attachment alleged.

.But the constructive fraud, arising from Baker's presence and silence at the sale—the concealment of his deed of trust, then, as well as before and afterwards—together with the consideration, that the effect of the trust conveyance, (a proper subject of Chancery jurisdiction,) must, necessarily, have been involved in the adjudication, are circumstances which sufficiently warrant the equitable interposition.

In the case of *Wendell* vs. *Van Renssalaer*,[a] the Chancellor of New York declared, that, where a person, having a conveyance of land, keeps it a secret, for several years, and, knowingly, suffers third persons, afterwards, to purchase parts of the same premises, and expend money on the land, without giving any notice of his claim, he will not be permitted, afterwards to assert his legal title, against such innocent and *bona fide* purchaser; and, to prevent which, Chancery will interpose. Many other cases, cited in argument, sustain the same principle, and shew, sufficiently, that such concealment of title deeds, whether for real or personal estate, is fraudulent; and that such fraud is considered, in Chancery, more fatal to the right claim, than in courts of law.

We are, therefore of opinion, that the concealment of the deed, and failure to assert the title under it,

[a] 1 John. Ch 344.

in proper time, connected with the fact of the slaves' being family negroes, was sufficient to give jurisdiction to Chancery; and no error appearing on any other point of exception, the decree of the court below must be affirmed.